UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ANN HATCH,

               Plaintiff,

    v.                                        Case No. 16-C-802

BRILLION SCHOOL DISTRICT,

               Defendant.

---

**DECISION AND ORDER GRANTING-IN-PART
AND DENYING-IN-PART SUMMARY JUDGMENT**

---

        Plaintiff Ann Hatch filed this action alleging that Defendant Brillion School District (the "District") discriminated against her based on her sex and age and retaliated against her for engaging in protected conduct, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"). Formerly a Middle School Principal, School Psychologist, and Special Education Coordinator in the District, Hatch has asserted claims arising out of her interactions with the District's Superintendent, Dr. Dominick P. Madison, in the years preceding the nonrenewal of her employment contract. The case is before the court on the District's motion for summary judgment. ECF No. 31. Also before the court is Hatch's motion for leave to file a memorandum of law in response to the District's reply brief in support of its motion for summary judgment. ECF No. 56. The court heard oral argument on both motions on June 7, 2018. For the reasons set forth below, Hatch's motion will be granted, and the District's motion for summary judgment will be granted-in-part and denied-in-part.

# LEGAL STANDARD

Summary judgment should be granted when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, the time and expense of the parties and the court should not be wasted on a trial when there are no material facts in dispute, one party is entitled to judgment on those facts, and thus there is nothing to try. In deciding a motion for summary judgment, all reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoted source and internal quotation marks omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In this case, the plaintiff bears the burden of proof on each essential element of her claims; the plaintiff must therefore show that there is evidence on which a reasonable jury could find in her favor.

With these standards in mind, what follows is the court's attempt to set out, in the light most favorable to Hatch as the nonmoving party, the undisputed material facts as gleaned from the properly submitted evidentiary materials of the parties. It is important to emphasize this is not a final or conclusive determination of the facts of the case; these are the facts if all of the plaintiff's evidence is believed.

2

# FACTS IN LIGHT MOST FAVORABLE TO PLAINTIFF

The District operates three public schools in the City of Brillion, Wisconsin: Brillion High School (grades 9–12), Brillion Middle School (grades 6–8), and Brillion Elementary School (early childhood and grades 1–5). Def.'s Proposed Findings of Fact ("DPFOF"), ECF No. 33 ¶ 1. The District's governing body is the School Board (the "Board"), which consists of seven members and is led by a President. *Id.* ¶ 2. As the body responsible for all employment decisions involving District administrators, the Board has final authority regarding matters such as offers of employment, salary and wage determination, and the renewal or non-renewal of employment contracts. *Id.* ¶ 3. During 2011, Brian Horn served as President of the Board, and Renee Maeder served as Vice President. *Id.* ¶¶ 4, 6. Horn has served as a member of the Board since 2003, and Maeder served as a member from 2007 to 2013. *Id.* Madison became the District's Superintendent in July 2005. *Id.* ¶ 11.

The events that form the basis of Hatch's claims began in 2011 and culminated in Hatch's resignation from her employment with the District in August 2012. *Id.* ¶ 8. Her resignation followed the Board's June 18, 2012 decision not to renew her employment contract beyond the 2012–2013 school year. *Id.* ¶¶ 8, 137. At the time of her resignation, Hatch had been employed by the District since 1987. *Id.* ¶ 8. For the majority of that time, she held the positions of School Psychologist and Special Education Coordinator while also serving as the boys' varsity golf coach. *Id.* ¶ 10.

Hatch became the Middle School Principal in July 2006. *Id.* ¶ 16. The promotion occurred as part of a plan that Madison began developing during 2005 and 2006 to restructure the District's administration by splitting the single, K–8 principal position into separate principal positions for the

elementary and middle schools. *Id.* ¶¶ 11, 13. Hatch had told Madison that she no longer wanted to focus exclusively on special education, and Madison ultimately recommended that the Board hire her for the new Middle School Principal position. *Id.* ¶¶ 14–15. The Board accepted Madison's recommendation. *Id.* ¶¶ 15–16. Hatch characterized her interactions with Madison as "professional" and his behavior as "good" during 2005 and 2006, before her promotion. *Id.* ¶ 19. The Middle School Principal role was not a standalone, full-time position, so Hatch continued to perform her duties as School Psychologist and, in a reduced capacity, Special Education Coordinator. *Id.* ¶¶ 16–18, 20. Together, those three roles comprised Hatch's full-time position as a District administrator. *Id.* ¶ 24.

Because Madison oversaw all District operations and supervised the District's administrators, including the school principals, he was Hatch's direct supervisor following her promotion to Middle School Principal. *Id* ¶¶ 11, 57–58. Madison was thus responsible for providing an annual written evaluation of her performance, as required by her employment contract. *Id.* ¶¶ 54–55; ECF No. 41-4 at 3; *see, e.g.*, ECF No. 35-2. When conducting an annual evaluation of a District principal, Madison asked the principal to create a list of proposed goals for the upcoming year and to complete a self-assessment regarding achievement of the previous year's goals. DPFOF ¶ 55. Madison then reviewed those materials, prepared a written performance review, and finalized the principal's goals for the upcoming year. *Id.* In January 2011, Madison prepared Hatch's annual written evaluation assessing whether she achieved her 2010 goals and establishing new goals for 2011. *Id.* ¶ 59; *see also* ECF No. 35-2. As part of that process, Madison also met with Hatch to discuss her 2011 goals. DPFOF ¶ 59.

4

Madison's discussions with Hatch in early 2011 resulted in the delineation of three goals for her that year: (1) "To develop practices and programs that promote diminishing separate building and subject manner"; (2) "To work with the elementary principal to have RtI [Response to Intervention] implemented in grades 1–8"; (3) and "Completion of assessment procedures in the middle school." ECF No. 35-2 at 3–4. The purpose of Hatch's first goal was to reduce the physical and functional boundaries between the middle school and the elementary school, which were housed in different buildings. DPFOF ¶ 62. As possible evidence of progress toward achieving this goal, the review suggested the establishment of a "literacy block" in the middle school, planning for multi-aged classrooms, adjustments to the 8-period daily class schedule, subject specialties done collaboratively, and team teaching of subjects between both specialists and classroom teachers. *Id.* ¶ 66. Hatch's second goal pertained to the implementation of "Response to Intervention" ("RtI"), a program for identifying children with learning and behavioral problems and providing them with early, effective learning interventions across several "Tiers" of increasingly intensive assistance, potentially culminating in a referral to special education programs. *Id.* ¶ 63. Potential evidence of progress towards achievement of this goal included every teacher being able to implement Tier 2 and Tier 3 interventions, special education teachers being assigned as intervention coaches to assist with intervention application, and significant diminishment of referrals for learning disabilities. *Id.* ¶ 67. Finally, Hatch's third goal pertained to implementing assessments or other means of measuring student performance in all courses offered as part of the middle school's curriculum. *Id.* ¶ 64. Hatch acknowledges that all of her 2011 goals were attainable, with the exception of implementation of a literacy block in the eighth grade, which did not have appropriate teaching staff available for such a program. *Id.* ¶ 68.

A series of interactions between Hatch and Madison during summer 2011 are central to this dispute. At some point in June 2011, Hatch communicated to Madison her desire to take Friday, September 2, 2011—the second day of the upcoming school year—off of work because she planned to attend a Wisconsin Badgers football game in Madison the night before to celebrate her fiftieth birthday with family and friends visiting from out of town. *Id.* ¶¶ 84, 88. After Madison denied Hatch's request to take the day off, Hatch complained to Renee Maeder in her capacity as the Board's Vice President. *Id.* ¶ 84. Maeder counseled Hatch to meet with Madison in person to discuss the request and explain her reasons for it. *Id.* ¶ 87.

After Hatch's conversation with Maeder, Madison and Hatch exchanged emails about Hatch's request on June 21, 2011. Madison initiated the conversation: "In looking at your calendar, we obviously did not communicate regarding time off on September 2nd. As it is the 2nd day of school, I see it as important that you are here and not off due to a Badger game the night before." ECF No. 35-5 at 2. Hatch responded:

> I did miss understand as you indicated to me while we were discussing this in Tiffanie's office that you did not tell me I could not have this day off but it was your preference I not take it off. I was also not clear in communicating with you that my birthday celebration begins with the game but other activities have been planned in my honor on Friday as well. I have family coming from DC and KC for this celebration. I am aware you set my working days, but I do want my communications with you to be clear.

*Id.* Madison replied: "Fine. Take the fucking day off." *Id.* Hatch ultimately did take September 2, 2011, off of work. *Id.* ¶ 107.

On June 29, 2011, Hatch called Maeder at work to report the language in Madison's reply email, characterizing it as rude and harassing. DPFOF ¶¶ 91. Maeder later went to the middle school and spoke with Hatch, who gave her a copy of the email exchange. *Id.* ¶ 93. After receiving

6

a copy of the emails from Hatch, Maeder called Board President Brian Horn to notify him about the emails. *Id.* ¶ 94. Horn called Hatch to apologize for Madison's conduct and informed her that he would investigate the matter. *Id.* ¶ 95. In reporting Madison's conduct to Horn and Maeder, Hatch also alleged that Madison had acted inappropriately towards other District employees, specifically Tiffanie Nigbor and Margie Bauknecht. *Id.* ¶ 96. Horn contacted both, and Maeder also contacted Nigbor to follow up on Hatch's insinuation that Nigbor left her position as Elementary School Principal not for family reasons, as she told the Board, but because of Madison's inappropriate behavior. *Id.* ¶¶ 97–98, 101. After inquiring into Hatch's complaint, Horn and Maeder met with Madison at the District office on July 12, 2011, to discuss his profane email to Hatch. *Id.* ¶ 102. They directed him to refrain from using profanity in his email communications and instructed him to apologize to Hatch, which he did on July 18, 2011, although Hatch felt it was disingenuous and forced. *Id.* ¶¶ 105–06; ECF No. 34-6 at 26; ECF No. 34-2 at 19.

In the meantime, while Horn and Maeder were following up on Hatch's complaint over Madison's email but before they met with Madison about it, Madison met with Hatch on July 11, 2011, ostensibly as part of a mid-year review of her progress toward achieving her 2011 goals. DPFOF ¶ 77. Madison had never given an administrator a mid-year review, and Hatch had never received one throughout twenty-four years in the District. Pl.'s Proposed Additional Facts ("PPAF"), ECF No. 40 ¶ 43. Treating the mid-year review as confidential, Madison neither shared it with the Board nor placed a copy in Hatch's personnel file at that time. DPFOF ¶ 74.

Hatch asserts that Madison began the July 11 meeting by telling her that complaints to Board members would not be tolerated and that she had to make him look good in front of the Board. PPAF ¶ 42. Madison also told her during the meeting that she would never coach golf in the district again, an activity that Madison knew was a source of pride and enjoyment for Hatch. *Id.* ¶ 15, 42.

7

Although all of Madison's evaluations of Hatch were positive prior to 2011, the mid-year review listed several deficiencies that Madison observed in Hatch's progress towards achieving her annual goals. DPFOF ¶ 34; ECF No. 35-4. Expressing "major concern" about her progress on her first goal, Madison observed that Hatch had "done very little to diminish . . . separation," noting that she had not visited a school with a 5th/6th grade multi-age classroom, had not utilized existing multi-age teachers in the District, and had told parents that the Superintendent (rather than the principal) was responsible for removing students from multi-age classrooms. ECF No. 35-4 at 2. Madison also observed that Hatch had made only "minimal" progress towards assigning Middle School teachers as intervention coaches. *Id.* at 3. The review concluded with a summary of Madison's concerns:

> During the course of the first six months of this calendar year review cycle, Ms. Hatch has demonstrated inadequate progress toward the goals set out for her. She has had several avenues to achieving her goals presented to her and she has not responded positively to these opportunities. Ms. Hatch needs to take the next six month [sic] and refocus on her goals. Effort needs to be made to develop systematic approaches to address student learning issues in her building including means to promote collaboration toward student learning, breaking down of barriers between subjects and grade levels, more teamwork between regular and special education, and clear means of leading how to identify learning goals and measures of those goals.

*Id.* at 3–4. Madison also contends that to increase the time available for Hatch to focus on her administrative duties, he relieved her of responsibility for implementing changes in the middle school Language Arts curriculum and of her duties as the boys' varsity golf coach. *Id.* at 3; DPFOF ¶ 79.

On August 30, 2011, Hatch's former attorney sent Horn a letter alleging that Madison violated Hatch's First Amendment rights by issuing the negative mid-year review in retaliation for Hatch's complaint to Horn and Maeder regarding the email. *Id.* ¶ 108; ECF No. 34-7. The letter made no claim that Madison's actions reflected retaliation based on her gender or sex, nor did the

letter recount Hatch's claim that Madison started off the meeting by warning her that complaints to the Board would not be tolerated and telling her she would never coach golf in the district again. DPFOF ¶ 109; ECF No. 34-7. In response, Horn issued a memorandum on behalf of the Board on September 21, 2011, stating that the Board had reviewed the letter from Hatch's attorney and determined that no further action was necessary because Madison had already apologized for his inappropriate email. *Id.* ¶ 110; ECF No. 34-6.

By all accounts, these events during summer 2011 led to a breakdown in trust and communication between Madison and Hatch and limited the effectiveness and cooperation of the administrative team as a whole. DPFOF ¶ 126 (no dispute). By January 2012, Hatch and Madison sharply diverged in their assessment of whether Hatch achieved her 2011 goals. In her self-assessment, Hatch listed eleven actions (and three ideas discussed) that she thought reflected evidence of progress towards achieving her first goal, seven actions reflecting progress towards her second goal, and one action reflecting progress toward her third. ECF No. 34-6 at 24–25. But in his written evaluation dated January 26, 2012, Madison concluded that Hatch "did not reflect on her goal achievement in a manner that was authentic or accurate" and therefore had "not shown evidence that she is able [to] critically assess her own performance." ECF No. 42-10 at 2. Listing shortcomings in Hatch's progress toward achieving each of the three goals, Madison concluded that she met neither her first nor her second goal and made only partial progress towards meeting the third. *Id.* at 2–3. Although Hatch had suggested goals in two new categories for 2012, Madison reassigned her first and second goals from the previous year on the ground that they "are still critical and attention must be given to them." *Id.* at 4. Madison did assign a new third goal: "Mathematic Differentiation instruction is implemented in grades 5–8." *Id.* Overall, Madison concluded that

"[t]he evidence is clear that Ms. Hatch has not been successful as an innovative, educational leader in her current position." *Id.* at 2.

Madison brought his concerns about Hatch's performance to the Board in May 2012. DPFOF ¶ 127. He presented the Board with information regarding Hatch's performance reviews, as well as deficiencies in her effort and progress towards completing her goals. *Id.* At a closed session of the Board on May 14, 2012, Madison then recommended nonrenewal of Hatch's employment contract as a District administrator. *Id.* ¶ 128. The nonrenewal of an educational contract is a serious, adverse employment action. PPAF ¶ 51. Wisconsin law affords a person whose contract is recommended for nonrenewal the right to a full hearing before the district board. Wis. Stat. 118.24. During his time as Superintendent in Brillion, for example, Madison has never hired anyone whose contract was previously nonrenewed. *Id.* Based on Madison's recommendation, the Board directed him to deliver Hatch a preliminary notice of consideration of nonrenewal of her contract. DPFOF ¶ 130.

Madison gave Hatch notice of the Board's decision by letter dated May 16, 2012. The letter advised Hatch that pursuant to Section 118.24(7) of the Wisconsin Statutes, she had the right to request either a public or private hearing before the Board on the decision. The letter explained that she would be provided the reasons for the nonrenewal decision prior to the hearing and would have the right to representation by counsel of her choice. The letter also explained that she would have the right to call and cross examine witnesses at the hearing, and offer rebuttal evidence. ECF No. 35-6.

Hatch responded on May 21, 2012, requesting the reasons for nonrenewal and a public hearing on the matter. *Id.* ¶ 132; ECF No. 35-6. In a June 11, 2012 letter, Madison gave Hatch

notice of a public hearing scheduled for June 18, 2012 and enumerated the four reasons he had recommended nonrenewal of her contract:

1. Not satisfactorily meeting professional goals as stated in the 2010-2011 year-end evaluation, the July 2011 mid-year review, and the 2011-2012 annual review;

2. Retaliatory behavior following evaluations and a lack of willingness or effort to work with the Superintendent to meet stated goals.

3. Failure to follow established and directed lines of communications; and

4. Lack of confidence and trust between you and the Superintendent that limits the effectiveness and ability of the administrative team to operate in the best interests of the District and its students.

ECF No. 35-8.

The public hearing occurred as scheduled on June 18, 2012. DPFOF ¶ 136. Hatch appeared, represented by counsel, and she, along with Madison and several other witnesses, testified at the hearing. *Id.*; *see also* ECF No. 34-10 at 1. At the conclusion of the hearing, the Board voted unanimously not to renew Hatch's contract, ending her employment with the District effective June 30, 2013. DPFOF ¶ 137. The Board issued Hatch a formal notice of nonrenewal signed by Board President Steve Klessig and Vice President Maeder on June 27, 2012. *Id.* ¶ 139. On August 23, 2012, Hatch submitted a resignation letter, stating that she had accepted a job in the Neenah School District, where she has been employed as a school psychologist ever since. *Id.* ¶¶ 140–42. Madison accepted her resignation the same day.

In the months following the June 2012 public hearing, Hatch pursued a complaint to the Equal Rights Division ("ERD") of the Wisconsin Department of Workforce Development. DPFOF ¶¶ 144–46. She originally filed the complaint on May 25, 2012, the day after she requested a public hearing before the Board regarding possible nonrenewal of her contract. ECF No. 34-11 at 3. The

complaint alleged that she had been discriminated against on the basis of her sex and her age. ECF No. 34-11 at 2. After the ERD found no probable cause to believe that the District had violated Wisconsin's fair employment law, Hatch appealed the finding. DPFOF ¶ 145. Although the matter was set for a hearing on March 15–16, 2016, Hatch withdrew her complaint shortly before the hearing and advised that she intended to instead file suit against the District in federal court. *Id.* ¶ 146. This lawsuit followed in June 2016.

As a final preliminary matter before turning to the merits of this motion, it is important to note that Hatch also makes several factual allegations that she contends are relevant to her discrimination claims. Some of these, such as the age, sex, level of pay, and amount of prior experience of various District administrators, are undisputed. *See, e.g.*, *id.* ¶¶ 5, 7, 9, 12, 22, 39–52. Others, particularly the nature of Madison's interactions with other administrators and District staff, which Hatch alleges reflects a pattern of discriminatory conduct based on age and sex, are disputed by the District. These disputed and undisputed facts will be discussed in greater detail as necessary in the analysis below.

## ANALYSIS

### I. Disputed Evidentiary Materials

Before reaching the merits of the District's summary judgment motion, the court must address an evidentiary dispute raised in the District's reply brief in support of its motion. There, the District argues that this court should refrain from considering seven affidavits and two sets of documents that present evidence the District contends Hatch did not disclose during discovery. ECF No. 52 at 1–4. The District also argues that the court should ignore an eighth affidavit on the grounds that it impermissibly contradicts earlier sworn testimony by the affiant. *Id.* at 5–6.

As a preliminary matter, Hatch has filed a motion seeking leave to file a memorandum of law in response to Defendant's reply brief. ECF No. 56. Consistent with Civil Local Rule 7(i), Hatch filed her proposed memorandum of law simultaneously with her motion. ECF No. 57. Essentially, Hatch seeks leave to file a sur-reply brief. Whether to grant a party leave to file a sur-reply brief is a question within the court's discretion. "The decision to permit the filing of a surreply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief." *Merax-Camacho v. United States*, 417 F. App'x 558, 559 (7th Cir. 2011) (citing *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 631 n.2 (7th Cir. 2010)). "In some instances, allowing the filing of a surreply 'vouchsafes the aggrieved party's right to be heard and provides the court with the information necessary to make an informed decision.'" *Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 922 (N.D. Ill. 2014) (quoting *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 320, 329 (N.D. Ill. 2005)). Hatch's motion for leave to file a responsive memorandum will be granted, as her memorandum of law will assist the court in sorting through this matter first raised in the District's reply brief.[1]

## A. Affidavits from Undisclosed Witnesses

Turning to the merits of the District's objections, it first argues that the court should disregard the affidavits submitted by seven individuals: Deborah Boettcher, Shannon Schindel, Lucy Hartenbach, Glenda Luebke, Paul Cooney, Sally White, and Mary Pfeiffer. ECF No. 52 at 3; *see also* ECF Nos. 43, 45–50. Neither Hatch's original Rule 26(a) disclosures nor her amended

---

[1] In a footnote at the end of its response to Hatch's motion for leave to file, the District asks for leave to file a reply to Hatch's response to the objections raised in the District's summary judgment reply brief. ECF No. 69 at 4 n.1. This request will be denied as moot because the District received the opportunity to reply during oral argument on the motions.

disclosures lists any of these seven people as an individual who she expected to rely on as a witness. ECF Nos. 53-1, 53-2. The District argues that Hatch had an obligation to disclose these witnesses and their testimony under Federal Rule of Civil Procedure 26(a) and that their testimony should now be excluded under Rule 37(c). In particular, the District explains, because Hatch failed to name these individuals as part of her Rule 26(a) disclosures, the District "fairly concluded that she did not intend to rely on these individuals to prove her claims," did not depose any of them during discovery, and would therefore be prejudiced if Hatch were now permitted to rely on their testimony.

Under Rule 26(a), each party must disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). Rule 26(e) creates a continuing duty to supplement those disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). In turn, Rule 37 provides that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The Seventh Circuit "has stated that 'the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless.'" *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (quoting *Salgado v Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998)). "The determination of whether a Rule 26(a)

violation is justified or harmless is entrusted to the broad discretion of the district court." *King v. Ford Motor Co.*, 872 F.3d 833, 838 (7th Cir. 2017). Factors that should guide the court's exercise of discretion include "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David*, 324 F.3d at 857 (citing *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir. 1995)).

Whereas the District seeks exclusion of the seven affidavits under Rule 37(c) for failure to include these witnesses among the Rule 26(a) disclosures, Hatch argues that the obligation to supplement her Rule 26(a) disclosures to add these witnesses never arose. Emphasizing Rule 26(e)'s exception for witnesses "otherwise . . . made known to the other parties during the discovery process," Hatch contends that she had no duty to amend her Rule 26(a) disclosures to identify these witnesses because she disclosed all of them at other points in the discovery process. ECF No. 57 at 2.

The names of five of the seven affiants appear in Hatch's responses to the District's first set of discovery requests. ECF No. 53-3. Boettcher and Schindel, among several other individuals, are named in Hatch's response to the District's Interrogatory No. 2, which asked Hatch to "[i]dentify each person likely to have discoverable knowledge or information related to the allegations in [her] Complaint." *Id.* at 11. Hartenbach, White, and Luebke, again among several others, are named in Hatch's response to the District's Interrogatory No. 8, which asked her to "[i]dentify each and every instance that any School District employee, agent or representative informed [her] there were complaints, other than hers, about Madison's behavior," including the identity of the person informing her. *Id.* at 15. A sixth affiant, Cooney, was discussed on several occasions during Hatch's

April 7, 2017 deposition. ECF No. 58-1. As for the seventh, Hatch states that she identified Pfeiffer in her supplemental answer to the District's Request for Production of Documents No. 2. ECF No. 56 at 2. But her responses to that document request contained in the record merely refer to Bates-stamped pages and do not mention Pfeiffer by name. ECF No. 53-5; ECF No. 53-4 at 31; ECF No. 53-3 at 22.

The court finds that any failure to disclose these individuals as witnesses was harmless. Of the seven challenged affidavits, the court will disregard only Pfeiffer's for purposes of resolving the District's motion for summary judgment. The District has been aware that Boettcher, Schindel, Hartenbach, White, and Luebke possessed potentially discoverable information—including information regarding other complaints about Madison, a common substantive theme among several of their affidavits—since Hatch named them in her response to the District's first set of discovery requests. ECF No. 53-3 at 11–12, 15. Likewise, the District demonstrated its own awareness of Cooney by mentioning him by name in its proposed findings of fact in support of its motion for summary judgment. ECF No. 33 ¶¶ 39–41. "[T]here is obvious prejudice in failing to disclose . . . a witness during discovery, as that prevent[s] [the defendant] from deposing [the witness] and conducting any appropriate follow-up discovery." *King*, 872 F.3d at 838. To the extent that Hatch failed to inform the District of her intention to rely on Boettcher, Schindel, Hartenbach, White, Luebke, and Cooney, that failure was harmless because it did nothing to prevent the District from seeking additional information about these individuals identified by Hatch. As Hatch notes, the District could have contacted any of these individuals when preparing its summary judgment motion, just as she did. Moreover, during oral argument, Hatch's counsel noted that Hatch would not object to the District deposing any of these individuals, should the case proceed to trial.

16

Hatch's failure to disclose Pfeiffer, however, actually created a problem for the District because it deprived the District of the option of choosing not to depose her. Accordingly, the court will not consider Pfeiffer's affidavit—or the proposed findings of fact it supports—in ruling on the District's motion for summary judgment.

## B. Undisclosed Documents

On similar grounds, the District objects to two sets of documents that Hatch relies on in opposing the District's motion for summary judgment: Hatch's handwritten personal calendars (ECF No. 41-1) and Schindel's personal travel records (ECF No. 46-1). The District again argues that Hatch should not be permitted to rely on these documents because they were not produced during discovery. ECF No. 52 at 4. Hatch counters that they were produced as soon as they were relevant and available. ECF No. 57 at 3. Regarding the calendar, she notes that it required time for redaction and became relevant only after Madison raised concerns during his September 18, 2017 deposition about the effect of Hatch's role as golf coach on her ability to perform her administrative duties. *Id.* As for Schindel's travel records, she notes that her counsel did not receive them from Schindel until November 22, 2017, after the close of discovery. *Id.*

The court declines the District's request to exclude these documents from consideration. Although perhaps surprising to the District, they present little risk of prejudicing the District's opposition to Hatch's claims, and as the following discussion shows, they have little to no impact on the court's assessment of the District's summary judgment motion. Moreover, Hatch's explanation for the delay in producing them does not suggest bad faith.

## C. Prozanzki's Affidavit

Finally, the District objects to Cathy Prozanski's affidavit on the grounds that it impermissibly contradicts sworn testimony that she gave in the past. ECF No. 52 at 5. "It is a well-settled rule [in

the Seventh Circuit] that a plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition and, in turn, defeat a defendant's motion for summary judgment." *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir. 1999) (citation omitted) (first citing *Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994); then citing *Sirvidas v. Comm. Edison Co.*, 60 F.3d 375, 379 (7th Cir. 1995)), *overruled on other grounds by Hill v. Tangeherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013). In the affidavit, Prozanski states that she "found Madison's behavior inappropriate and troubling" at times and that she "found him overbearing, unpredictable, and uncomfortable to work under." ECF No. 44 ¶¶ 22–23. But at the June 18, 2012 hearing before the Board regarding Hatch's contract renewal, Prozanski testified under oath regarding her working relationship with Madison, saying it was, "Fine. Fine. [Madison] and I generally didn't really have any issues." ECF No. 53-7 at 7.

It is not clear that Prozanski's affidavit contradicts her testimony to the Board. In both the affidavit and her hearing testimony, Prozanski recounts an incident in which Madison sent her a text from a bar following a work event saying, "WTF, why are you back at the hotel already?" *Compare* ECF No. 53-7 at 8, *with* ECF No. 44 ¶ 6. And while the affidavit articulates concerns about her working relationship with Madison in greater detail than the hearing testimony, the testimony is far from a ringing endorsement of her working relationship with him. Prozanski testified that she "battled" with Madison on philosophical matters such as curriculum development, and although she said these interactions were "not in a disrespectful way," she also admitted that Madison made her cry during a particularly intense discussion in August 2011. ECF No. 53-7 at 7–9. Because Prozanski's affidavit elaborates on, rather than contradicts, matters discussed in her sworn testimony to the Board, it will not be excluded from consideration.

## II. Summary Judgment

The District has moved for summary judgment on Hatch's discrimination and retaliation claims, asserting that there is no genuine issue of material fact as to either. In its brief, the District argues that Hatch cannot succeed on claims that the District discriminated against her in setting her wages, in the conditions of her employment, or in making the decision not to renew her employment contract under either Title VII or the ADEA. At oral argument, however, Hatch clarified that she raises claims for discrimination only on the basis of the nonrenewal of her contract, so the court will address only that aspect of the District's argument. The District also argues that Hatch cannot show that it retaliated against her by not renewing her employment contract because she complained about age and sex discrimination. The court will address each of Hatch's claims in turn.

### A. Discrimination Claims

Title VII prohibits an employer from discriminating against an employee on the basis of the employee's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). The ADEA likewise prohibits employers from refusing to hire, discharging, or otherwise discriminating against an individual on the basis of age, although the ADEA limits its protected class to individuals over 40 years of age. 29 U.S.C. §§ 623(a)(1), 631(a).

A plaintiff can prove discrimination through either the direct or indirect method of proof. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). Under the direct method, the plaintiff must point to direct or circumstantial evidence showing that her employer subjected her to an adverse employment action on the basis of her sex or age. *Id.* Under the indirect method, the plaintiff may proceed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1983), by establishing that "(1) she is a member of a protected class; (2) at

the time of termination, she was meeting her employer's legitimate employment expectations; (3) in spite of meeting the legitimate employment expectations of her employer, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated male or younger employees." *Peele v. Cty. Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). If the plaintiff satisfies this burden, then the employer must articulate "a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). "No matter the framework employed, the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).

Hatch does not have direct evidence that the District discriminated against her on the basis of her sex or her age. Madison expressly denies considering Hatch's sex or age when recommending nonrenewal of her contract to the Board. DPFOF ¶ 55. In the absence of direct evidence of discrimination, Hatch must proceed under the *McDonnell Douglas* framework. There is no dispute that Hatch is a member of a protected class for both her Title VII claims and her ADEA claims and that she experienced an adverse employment action. But the District contends that she nevertheless cannot establish the prima facie case of discrimination required under the framework's first prong. Overall, the District argues that Hatch cannot show that she was meeting the District's legitimate employment expectations. The District also raises more pointed arguments that she cannot show that she was treated less favorably than similarly situated male or younger employees with regard to the District's decision not to renew her contract.

If an employee fails to perform her job duties consistent with her employer's legitimate expectations, then "the inference that [she] would not have been fired had [she] not been a member of a protected group is very weak—so weak that the factfinder should not be allowed to speculate on the motive for the termination." *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997). "[W]hen a district court evaluates the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance but 'whether the employee was performing well at the time of [her] termination.'" *Peele*, 288 F.3d at 329 (second alteration in original) (quoting *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991)). Of course, this does not mean that past performance is irrelevant, especially where there is a sudden and unexplained change in the same supervisor's evaluation of an employee.

Relying on Madison's mid-year review of Hatch in July 2011 and Hatch's January 2012 annual review, the District argues that the record unambiguously shows that Hatch failed to make adequate progress towards achieving her goals and therefore necessarily fell short of the District's legitimate expectations as her employer. Hatch vigorously contests this characterization of her performance. Although there is no dispute that Madison ultimately acknowledged that Hatch met her third goal and that it was not reassigned for 2012 (PPAF ¶ 78), Hatch argues that the record shows progress towards completion of her other two goals for 2011 as well.

With regard to her first goal—diminishing separate buildings and subject manner—Hatch maintains that she took several actions throughout 2011 that show evidence of completion. Many of these examples correspond to her self-evaluation completed for Madison ahead of her January 2012 review. ECF No. 34-6 at 24. She points out that she scheduled a literacy block in the sixth

grade beginning in the 2011–2012 school year and in the seventh grade beginning in the 2012–2013 school year, and that delays in scheduling the seventh grade literacy block, as well as the absence of an eighth grade literacy block, were the result of teacher staffing limitations beyond her control (of which Madison was aware). ECF No. 42 ¶ 7; *see also* ECF No. 47 ¶ 11.[2] She contends that the implementation of literacy blocks was the only adjustment to the 8-period daily class schedule ever contemplated. ECF No. 42 ¶ 8. To promote team teaching, Hatch notes that she instituted weekly meetings attended by grade-level teacher teams, and she personally attended those meetings biweekly. *Id.* ¶ 9; *see also* ECF No. 47 ¶¶ 8–10. She also visited multi-age classrooms in Green Bay in April 2011 and in Milwaukee in November 2011. ECF No. 42 ¶ 19. All of these actions correspond to examples of potential evidence of achievement noted on Hatch's January 2011 review. DPFOF ¶ 66.

Hatch likewise cites evidence of progress towards her second goal for 2011. She notes that RtI was fully implemented in the middle school by the end of spring semester 2011, meaning that several students were identified for Tier II and III interventions and had begun receiving them. ECF No. 42 ¶ 20. The District also purchased software to help implement this program. *Id.* ¶¶ 20–21.

---

[2] An affidavit from Glenda Luebke, a special education teacher in grades five through eight in the District between 2005 and 2014, notes the existence of these literacy blocks. ECF No. 47 ¶ 11. The court recognizes that "general statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994)). Luebke's statements regarding the creation of literacy blocks, however, offer not a general statement about the adequacy of Hatch's compliance with her goals but an observation corroborating what Hatch alleges is a material fact. Accordingly, the court will consider the affidavits from Luebke and other District employees in this analysis to the extent that they offer concrete information regarding possible disputes of material facts.

As discussed above, however, Madison's January 2012 review of Hatch's completion of her 2011 goals charged her with several deficiencies in her performance. ECF No. 42-10. In concluding that Hatch had not met her first goal, Madison observed that "[t]he goal of having school-wide literacy blocks has not been met"; "[t]he multi-age classroom has not been smoothly implemented and Ms. Hatch has not shown a real desire to break down the barriers between 5th and 6th grade"; "[t]he middle school still operates on an 8 period day"; and "little to no systematic effort has been made by Ms. Hatch to work to develop classes that are co-taught." *Id.* at 2–3. Madison also identified several shortcomings in her progress towards her second goal, noting that there was "little collaboration" with implementation of RtI in the elementary school; that staff had not received adequate RtI training, particularly with regard to Tier II and Tier III interventions; that Hatch placed too much emphasis on intervention regarding learning issues, rather than behavior issues; and that special education teachers were not adequately utilized as intervention coaches. *Id.* at 3.

Based on this record, the court is satisfied that Hatch has met her initial burden of showing that a dispute of material fact exists as to whether she met the District's legitimate employment expectations. Hatch admits that all of her 2011 goals, except the implementation of a literacy block in the eighth grade, were attainable (DPFOF ¶ 68), so there is no dispute regarding the legitimacy of the District's expectations for her in 2011. The record shows, however, a stark divergence between Hatch and Madison as to whether her actions during 2011 actually reflected adequate progress towards achieving her goals. Considering the record in the light most favorable to Hatch, a jury could reasonably conclude that she satisfied the District's legitimate expectations during 2011. Accordingly, Hatch satisfies this element of the first prong of the *McDonnell Douglas* framework for purposes of summary judgment.

To make her prima facie case under the *McDonnell Douglas* framework, however, Hatch must also show that she experienced adverse employment action reflecting less favorable treatment than similarly situated male or younger employees received. Hatch contends that she experienced adverse employment action in the form of the Board's decision not to renew her contract, which she contends was the product of discriminatory animus based on her age and sex. She argues that the District has waived its right to summary judgment on this claim by failing to develop the issue in its opening brief. ECF No. 38 at 25. The District's opening brief, however, does ask for dismissal of *all* of Hatch's claims and makes a short argument that the District had non-discriminatory reasons for deciding not to renew Hatch's contract. ECF No. 32 at 5, 30–31. Because Hatch's brief then presents her argument that a jury could reasonably infer discrimination by the District in the nonrenewal of her contract based on Madison's history of discriminatory behavior, the court will proceed to address this argument, considering the evidence in the light most favorable to Hatch. There is no dispute that the nonrenewal of Hatch's employment contract was a materially adverse employment action, and Hatch therefore argues that "the appropriate question on summary judgment is simply: could a reasonable jury find based on *all* available evidence that a discriminatory . . . motive caused [Hatch's] termination?" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 569 (7th Cir. 2017) (citing *Williams v. Office of the Chief Judge of Cook Cty.*, 839 F.3d 617, 626 (7th Cir. 2016)).

To make this argument, Hatch presents the court with a collection of statements Madison allegedly made and actions he allegedly took over the years that she contends show evidence of a motive to discriminate based on both sex and age. She recounts various demeaning things that Madison said to her, including, "You don't know what you're talking about"; "What planet do you

24

come from?"; "You're old"; "You'd better go take your estrogen pill"; "Things aren't clicking up there"; and "Well you're just a woman, what can I expect?"  PPAF ¶ 22.  Madison allegedly told Hatch that she was "lucky" to be coaching a boys varsity sport because she was a woman.  *Id.* ¶ 19. And Hatch alleges that she heard Madison use the word "bitch" to refer to women.  *Id.* ¶ 22.  The District denies that Madison made any of these statements.

Many other allegations about Madison come from Prozanski, who states that Madison often talked about female teachers in terms of status—whether they were married, how many kids they had, and how they looked—rather than about their professional skills and abilities.  ECF No. 44 ¶ 21. For example, Prozanski states that Madison made comments such as "She's a beautiful woman" when showing fondness for an attractive, recently divorced teacher in her early thirties.  *Id.* ¶ 20. At the Brillion Chamber of Commerce dinner in October 2011, Prozanski also allegedly heard Madison state, "We can no longer have menopausal women in a classroom with the door closed with pubescent males."  *Id.* ¶ 8.  Prozanski also alleges that Madison made multiple comments about breastfeeding, saying on one occasion, while Prozanski was meeting with Hatch in a room with the door locked, "What are you two doing, breastfeeding in there?"  *Id.* ¶ 13.  On another occasion, Prozanski claims, Madison said to her, "Well, at least we don't have anyone breastfeeding now," referring to Nigbor, who had periodically taken breaks to pump breastmilk following her return to work after the birth of her child.  *Id.* ¶ 14.  The District also disputes all of these statements that Prozanski attributes to Madison.

The Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, is instructive for assessing the role that a history of discriminatory comments plays in evaluating the presence of a discriminatory motive.  834 F.3d 760 (7th Cir. 2016).  There, Ortiz was fired by his shipping

company employer after he altered records to show that he had not brokered certain loss-incurring loads that another broker had actually booked in his name without his consent. *Id.* at 761–62. Afterwards, Ortiz brought a Title VII claim, noting that his supervisors had subjected him "to a barrage of ethnic slurs" that "increased in frequency and intensity in the months leading up to his discharge." *Id.* at 763 (listing slurs). In reversing the district court's grant of summary judgment to the employer, the Seventh Circuit noted that the fundamental question in the case was "[w]hether a reasonable juror could conclude that Ortiz would have kept his job if had a different ethnicity, and everything else had remained the same." *Id.* at 764. Considering the pattern of derogatory comments together with Ortiz's termination, the Seventh Circuit concluded:

> A reasonable juror could infer that [Ortiz's supervisors] didn't much like Hispanics . . . and tried to pin heavy losses on Ortiz to force him out the door. A juror also might infer that, because of Ortiz's ethnicity, [the shipping company's] managers fired him for using techniques that were tolerated when practiced by other brokers. In the end a jury might not credit Ortiz's evidence and could accept Werner's explanations. But given the conflict on material issues, a trial is necessary.

*Id.* at 766.

The circumstances surrounding Hatch's termination roughly parallel those of *Ortiz*. She presented evidence that Madison had a history of making discriminatory comments to and about women, particularly older women, and of treating them differently in the workplace. Despite a long history of stellar annual performance reviews, a promotion to the Middle School Principal position advocated by Madison, and the offer of a four-year contract extension in spring 2011, Hatch suddenly received an irregular—and unusually negative—mid-year performance review from Madison just days after she informed members of the Board about his vulgar email regarding her vacation request. The sudden shift in Madison's evaluation of Hatch's performance culminated in the non-renewal of her contract the following summer. As in *Ortiz*, a reasonable juror could infer

that Madison's prior behavior reflected discriminatory animus based on Hatch's age or sex, and that Hatch may have kept her job under similar circumstances if she were younger, a man, or both.

This is not, as the District argues, a situation where the court can disregard Madison's comments as isolated remarks disconnected from the termination decision, such as in *Bahl v. Royal Indemnity Co.*, 115 F.3d 1283 (7th Cir. 1997), and *Dass v. Chicago Board of Education*, 675 F.3d 1060 (7th Cir. 2012). In *Bahl*, the plaintiff alleged discriminatory termination from his position as an insurance underwriter based on national origin because some of his supervisors had made fun of his Indian accent, for example saying that "he had to 'think Indian first' before thinking in English." 115 F.3d at 1289. Nevertheless, the employer had "a legitimate nondiscriminatory termination reason" because an auditor separate from the plaintiff's supervisor found that "Bahl's files demonstrated noncompliance with company and regulatory procedures." *Id.* at 1289. The problems were so serious that, had a state insurance auditor rather than an internal investigation discovered the deficiencies, the company could have faced substantial fines or even the loss of its license to do business in Illinois. *Id.* at 1288. Similarly, the teacher plaintiff in *Dass* noted that, prior to the nonrenewal of her teaching contract, her supervising principal had suggested that she go teach in another part of the City "where most of the Indian kids go." 675 F.3d at 1071–72. But there was no dispute that the plaintiff was incapable of maintaining order or discipline in her classroom; in fact, the plaintiff "admit[ted] that while she served as a seventh grade teacher, her classroom was out of control—specifically that her students did not pay attention to her and were disruptive." *Id.* at 1067, 1072.

Critically, both cases involved undisputed legitimate bases for the terminations, despite the presence of the derogatory comments. The mere presence of "isolated, 'stray workplace remarks'

27

that [were] not clearly linked to the decision to terminate" was not sufficient to support a finding of discrimination. *Bahl*, 115 F.3d at 1293; *Dass*, 675 F.3d at 1072 ("The comment was not contemporaneous to or causally related to the discharge."). Here, by contrast, there is no independent justification for the non-renewal of Hatch's contract separate from the performance reviews conducted by Madison. Because those negative performance reviews marked a drastic change from Hatch's long history of positive reviews—including several by Madison himself—a reasonable juror could conclude that Madison's history of derogatory comments provides evidence of a discriminatory mindset based on Hatch's age or gender in his response to her decision to report his email to the Board.

## B. Retaliation Claims

In addition to her general discrimination claims, Hatch makes a more pointed claim that the District retaliated against her by adopting Madison's recommendation not to renew her employment contract. Under Title VII, an employer may not "discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice . . . , or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). The ADEA likewise makes it unlawful for an employer to "discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation." 29 U.S.C. § 623(d).

Like on a discrimination claim, "[t]o survive summary judgment on a timely retaliation claim, plaintiff must offer evidence of: '(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two.'" *Skiba v. Ill. Cent. R.R. Co.*,

884 F.3d 708, 718 (7th Cir. 2018) (quoting *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017)). The District primarily argues that Hatch cannot show that she engaged in statutorily protected activity, and it also contends that there is no causal connection between her claimed protected activity and the District's ultimate decision not to renew her contract.

To constitute protected activity, an action "requires more than simply a complaint about some situation at work, no matter how valid the complaint might be." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016). Any complaint "must indicate [that] discrimination occurred because of sex, race, national origin, or some other protected class." *Skiba*, 884 F.3d at 718 (alteration in original; internal quotation marks omitted) (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id.* (quoting *Tomanovich*, 457 F.3d at 663).

The District asserts that Hatch did not engage in any protected activity until the ERD received her complaint on May 25, 2012. ECF No. 32 at 28; *see also* ECF No 34-11. Hatch counters that she informed Maeder during a June 8, 2011, conversation that Madison was harassing her on the basis of her age and that she may have mentioned harassment on the basis of her sex as well. PPAF ¶ 36. At her deposition, however, Hatch could not "with 100 percent certainty" say that she thought Madison was harassing her based on her sex, although she was confident that she mentioned her age to Maeder as a possible explanation for Madison's treatment of her. ECF No. 34-2 at 20. Maeder does not remember Hatch ever mentioning her age or sex as a possible basis for discrimination during this June 8, 2011 meeting. ECF No. 36 ¶ 3. Notably, Hatch's former lawyer's August 30, 2011 letter to the Board alleged retaliation based on an exercise of her First

Amendment right to free speech, rather than her sex or gender. ECF No. 34-7. At oral argument, Hatch's counsel acknowledged that Hatch could not testify to having personal knowledge of mentioning discrimination based on sex to Maeder on June 8, 2011. *See* Fed. R. Evid. 602.

Because Hatch's May 25, 2012, complaint to the ERD is therefore her first action clearly alleging discrimination based on her *sex* sufficient to constitute protected activity, her Title VII claim for retaliation can survive summary judgment only if filing that complaint caused the District not to renew her contract. But the record is clear that it would have been impossible for the complaint to do so. After she filed the complaint on May 25, 2012, the Board decided not to renew her contract at the June 18, 2012 hearing and then gave her formal notice of nonrenewal on June 27, 2012. Both of those key decision dates precede the Board's receipt of notice of Hatch's ERD complaint in a July 5, 2012 letter. ECF No. 34-11 at 1. Consequently, there is no dispute of material fact regarding her Title VII retaliation claim, which cannot survive summary judgment. Nonetheless, because Hatch asserts that on June 8, 2011, she told Maeder that Madison was harassing her based on her age, but Maeder asserts that Hatch did not, a dispute of material fact exists with regard to whether Hatch engaged in protected activity to support her ADEA retaliation claim.

Although there is no dispute that the nonrenewal of Hatch's contract was an adverse employment action, she must also show that there is a dispute of material fact as to the existence of a causal connection between her protected activity (complaining about age discrimination) and the nonrenewal. "To establish a causal link, [a plaintiff] only [has] to establish 'that the protected activity and the adverse action were not wholly unrelated.'" *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1014 (7th Cir. 1997). Particularly relevant here, the Seventh Circuit has observed that "an employer's sudden dissatisfaction with an employee's

performance after that employee engaged in a protected activity may constitute circumstantial evidence of causation." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (citing *Lang v. Ill. Dep't of Children & Fam. Servs.*, 361 F.3d 416, 419–21 (7th Cir. 2004)). Despite Hatch's long history of positive performance reviews and Madison's offer of a four-year contract extension in spring 2011, Madison surprised Hatch with an extraordinary mid-year review mere weeks after she states that she complained to a Board member about age discrimination. This unanticipated deviation from the District's standard performance review practice and from Hatch's history of good reviews provides a sufficient basis to conclude that a dispute of material fact exists as to whether Hatch's protected activity of complaining to Maeder regarding age discrimination caused the adverse employment action of the nonrenewal of her contract.

## CONCLUSION

For the reasons set forth above, Hatch's motion for leave to file a memorandum of law (ECF No. 56) is **GRANTED**. The District's motion for summary judgment (ECF No. 31) is **GRANTED -IN-PART and DENIED-IN-PART**. Hatch's Title VII retaliation claim is dismissed, but disputes of material fact exists with regard to her ADEA retaliation claim, as well as her sex and age discrimination claims. The Clerk is directed to set this matter for a telephone conference to discuss scheduling a trial date.

**SO ORDERED** this 9th day of July, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court